FRANK MCNIEL, M.D. and JANET )
MCNIEL, M.D., ) Davidson Chancery
) No. 95-1400-I
    Petitioners/Appellants, )
)
VS. )
) Appeal No.
TENNESSEE BOARD OF MEDICAL ) 01-A-01-9608-CH-00383
EXAMINERS, )
)
    Respondent/Appellee. )

**FILED**

**March 5, 1997**

Cecil W. Crowson
Appellate Court Clerk

IN THE COURT OF APPEALS OF TENNESSEE
MIDDLE SECTION AT NASHVILLE

APPEALED FROM THE CHANCERY COURT OF DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

HONORABLE IRVIN H. KILCREASE, JR., CHANCELLOR

WATKINS, MCGUGIN, MCNEILLY & ROWAN
Frank J. Scanlon  #3588
214 Second Avenue North
Suite 300
Nashville, TN 37201

ATTORNEY FOR PLAINTIFFS/APPELLANTS


Michelle K. Hohnke #16736
Assistant Attorney General
1510 Parkway Towers
404 James Robertson Parkway
Nashville, TN 37243-0499

ATTORNEY FOR DEFENDANT/APPELLEE

REVERSED, VACATED AND REMANDED


HENRY F. TODD
PRESIDING JUDGE, MIDDLE SECTION


CONCUR:
SAMUEL L. LEWIS, JUDGE


CONCURS IN SEPARATE OPINION:
WILLIAM C. KOCH, JR., JUDGE

| FRANK MCNIEL, M.D. and JANET | ) |
| MCNIEL, M.D., | ) Davidson Chancery |
| | ) No. 95-1400-I |
| Petitioners/Appellants, | ) |
| | ) |
| VS. | ) |
| | ) Appeal No. |
| TENNESSEE BOARD OF MEDICAL | ) 01-A-01-9608-CH-00383 |
| EXAMINERS, | ) |
| | ) |
| Respondent/Appellee. | ) |

## O P I N I O N

The captioned petitioners sought judicial review and reversal of the administrative order of the respondent Board subjecting them to discipline for professional misconduct. From a judgment affirming the administrative order, the petitioners have appealed, presenting the issue for review in the following terms:

> The Petitioner-Appellants, Frank McNiel, M.D. and Janet McNiel, M.D., respectfully submit that the issue presented for review in this case is whether or not the Tennessee Board of Medical Examiners' decision to discipline their license to practice medicine in Tennessee should be reversed pursuant to T.C.A. §4-5-322(h) of the Tennessee Uniform Administrative Procedures Act, in that the decision was not supported by substantial and material evidence and was otherwise arbitrary and capricious.

> Specifically, this Court must determine whether or not to uphold, under T.C.A. § 4-5-322(h), the Board's conclusions of law that Frank McNiel, M.D. and Janet McNiel, M.D. in prescribing controlled substances to 16 patients for chronic, nonmalignant pain, incompetence, unprofessional and unethical conduct, prescribing not in good faith to cure an ailment and prescribing to addicts without an attempt to cure their addiction in violation of T.C.A. § 63-6-214(b)(1), (4), (12) and (13) of the Tennessee Medical Practice Act.

T.C.A. § 4-5-322(h) reads as follows:

> (h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

> (1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the Agency;

(3) Made upon unlawful procedure;

(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5) Unsupported by evidence which is both substantial and material in the light of the entire record.

In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

T.C.A. § 63-6-214 reads in pertinent part as follows:

**63-6-214. Grounds for license denial, suspension revocation - Reporting misconduct. -** (a) The board has the power to:

(3) Suspend or limit or restrict a previously issued license for such time and in such manner as the Board may determine.

- - -

(4) Reprimand or take such action in relation to disciplining an applicant or licensee, including, but not limited to, informal settlements, private censures and warnings, as the board in its discretion may deem proper; or

- - -

(b) The grounds upon which the board shall exercise such power include, but are not limited to:

(1) Unprofessional, dishonorable or unethical conduct.

(4) Gross malpractice, or a pattern of continued or repeated malpractice, ignorance, negligence or incompetence in the course of medical practice.

- - -

(12) Dispensing, prescribing or otherwise distributing any controlled substance or any other drug not in the course of professional practice, or not in good faith to relieve pain and suffering, or not to cure an ailment, physical infirmity or disease, or in amounts and/or for durations not medically necessary, advisable or justified for a diagnosed condition.

(13) Dispensing, prescribing or otherwise distributing to any person a controlled substance or other drug if such person is addicted to the habit of using controlled substances without making a bona fide effort to cure the habit of such patient.

The Petitioners are spouses and associates in the practice of medicine under licensure and

– 3 –

regulation by the Board. On March 25, 1994, and March 28, 1994, Dr. Frank McNiel was served with charges and amended charges of violation of T.C.A. § 63-6-214(b), (1), (4), (12) and (13). On April 24, 1994, Dr. Janet McNiel was served with similar charges. On May 27, 1994, the two cases were consolidated, and hearings were held in August and September 19, 1994, and January and February, 1995, at the conclusion of which the following discussion occurred between members of the Board:

> MR. McCALLUM: We'll get to that. Now then gentlemen, what are your wishes? We have heard no dispute regarding the 50 some odd facts presented in the original charge.

> MR. CUNNINGHAM: I move that we accept these facts as presented in the original charge. Not the last handout, the original charge. Those are not contested, as you say, as facts.

> DR. BOLTON: I'll agree and second that.

> MR. McCALLUM: All those in favor say aye. And the Chairman votes aye.

> (Whereupon, said motion carried unanimously.)

> MR. McCALLUM: So therefore we have accepted the facts as presented in the original statement of charges.

> MR. McCALLUM: Okay. You adopted the findings of fact. That we are also adopting the allegations of law. We haven't.

> THE COURT: So you couldn't be done with your deliberations as to that because you have to decide what violations of law there were. That's what we are down to.

> MR. McCALLUM: So therefore, we are now down to what are the violations of law that apply.

> DR. BOLTON: I would suggest then that we take the violations separately as it's in this packet and go through the violations.

> MR. McCALLUM: What page are you on?

> BY DR. BOLTON: I am on page 26.

> MR. McCALLUM: You are saying that you would like to propose that we strike dishonorable from number one and adopt the other two.

> DR. BOLTON: Yes, sir.

MR. McCALLUM; Dr. Cunningham, are in concurrence with this?

MR. CUNNINGHAM: Yes.

MR. McCALLUM: and the Chairman is too. So therefore all three people have expressed a positive desire for this. Number two.

MR. McCALLUM: So you're recommending that line two we strike gross malpractice and in line three we strike malpractice. What about it, Dr. Cunningham?

MR. McCALLUM: So therefore we are in agreement that you strike gross malpractice from line two and malpractice and ignorance from number two?

MR. McCALLUM: Leave that in. The only change in number three according to what you would like to see is to remove dispensing. Rest of it would remain the same.

MR. McCALLUM: Now, then for Dr. Janet McNiel, do you want the same changes in this?

DR. BOLTON: I would make a motion that the same changes here on her cause of action that we did under Dr. Frank McNiel.

MR. CUNNINGHAM: I second the motion.

MR. McCALLUM: Motion has been made and seconded that the causes or action that we will adopt will be the same as those that we have edited for Dr. Frank McNiel. All those in favor let it be known by saying Aye.

(Whereupon, motion carried unanimously.)

The charges to which the board referred to are included in a 29-page document which is appended to this opinion. The written finding of facts of the Board tracks verbatim the statements of fact in the charges, and concludes with the following summary of facts:

Respondent has administered controlled, mind-altering substances to these patients, and to many additional patients as is reflected within several area pharmacy drug audits, in a rote fashion, rather than in a fashion tailored to the specific needs of the individual patient. Particularly with respect to his administration of benzodiazepines, respondent has routinely administered the highest Valium dosage (10 mg) to most of his patients without ever attempting to titrate such dosages to individual patient needs.

Respondent has, in many instances, administered these controlled substances in excess of the recommended daily dosage limitations as indicated by the Physicians Desk Reference. His chronic, repeated administration of Schedule II-IV narcotic analgesics such as Lortab, Lorcet Plus, Vicodin, Percodan, Percocet, Tylenol (#3 & #4), Darvon and Darvocet for periods of time approximating 3 years in some patients is not recommended within this treatise, nor is such chronic administration of these substances recognized as appropriate care as a family practice physician, particularly when combined with administration of sedating benzoatespines and sedative hypnotics (Phenobarbital and Halcyon) on such a long-term, chronic basis, Respondent's administration of such combinations in such a chronic fashion fell below the standard of care expected of a reasonably competent primary case or family practice physician practicing in the State of Tennessee.

Respondent constantly administered the combination of benzodiazepines and narcotic analgesics in a chronic fashion to most of the ten patients referred to herein (and to many others, too numerous to list), without attempting to justify or take precautions against the sedating, and potentially addictive consequences these combinations could have. In many instances, Respondent did not recognize, and in fact rewarded, drug-seeking behavior manifested by his patients. This conduct on Respondent's part fell below the standard of care of a reasonably competent primary care or family practice physician practicing in Tennessee.

Respondent's chronic use of narcotic analgesics for management of non malignant pain in many patients fell below the standard of care expected of a reasonably competent family practitioner or primary care physician practicing in the State of Tennessee, which is that narcotics are to be avoided except in limited, acute pain cases, and, only after all other specific therapies have been exhausted and the patient has been evaluated according to a multidisciplinary approach, including referrals to orthopedists, neurological surgeons, administration of steroidal anti-inflammatory drugs, antidepressants, administration of a TENS unit, and hypnosis. None of the ten patients referred to herein suffered from malignant pain caused by organic disease, and the Respondent did not limit his administration of narcotics to short-term, intermittent, acute cases.

Respondent did not, in any of the ten cases referred to herein, or in general with respect to most other patients, either refer patients to alternative therapies or to specialists in pain management, or refrain from continuing administration of strong narcotic analgesics and benzodiazepines while the patients were simultaneously undergoing treatment by such mental health and pain specialists.

The written "conclusions of law of the Board" state:

> The Findings of Fact in this Order are sufficient to establish violation by the Respondent of the following provisions of the Tennessee Medical Practice Act, T.C.A. §§ 63-6-101 et seq.) for which disciplinary action before and by the Board is authorized.
>
> 1. T.C.A. § 63-6-214(b)(1), which authorizes the Board to discipline a licensee for engaging in conduct which is unprofessional or unethical;
>
> 2. T.C.A. § 63-6-214(b)(4), which authorizes the Board to discipline a licensee for a pattern of continued or repeated negligence or incompetence in the course of medical practice;
>
> 3. T.C.A. § 63-6-214(b)(12), which authorizes the Board to discipline a licensee for prescribing or otherwise distributing any controlled substance or any other drug not in the course of professional practice, or not in good faith to relieve pain and suffering, or not to cure an ailment, physical infirmity or disease; and
>
> 4. T.C.A. § 63-6-214(b)(13), which authorizes the Board to discipline a licensee for prescribing or otherwise distributing to any person a controlled substance or other drug if such person is addicted to the habit of using controlled substances without making a bona fide effort to cure the habit of such patient.

Decisions of an administrative agency are subject to reversal by the Courts if they are unsupported by substantial and material evidence, or are arbitrary and capricious. T.C.A. § 4-5-322 (h) (4) and (5), above.

Substantial and material evidence is such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration. *Southern Railway Company v. State Board of Equalization*, Tenn. App.1984, 682 S.W.2d 196, 199.

Substantial and material evidence is something less than a preponderance of the evidence, but more than a scintilla or glimmer. *Wayne County v. Solid Waste Disposal Control Board.* Tenn.

App. 1988, 756 S.W.2d 274, 280.

The records of the respondents and their testimony adequately support the specific facts found by the Board. The difficulty lies in the lack of expert testimony evaluating those facts in terms of violation of the quoted statute.

The charges and supporting evidence against Dr. Frank McNiel arose out of his dealings with ten individuals identified anonymously in the record as A, B, C, D, E, F, G, G and I.

Dr. Frank McNiel admitted that there were "red flags" in the record of patient C, including Dr. McNiel's doubts as to his claim of theft of some of his medication, that C was using the medication for other than pain and anxiety control -; that Dr. McNiel was convinced that he "had drug seeking behavior" and that he had a history of drug abuse.

Dr. Frank McNiel admitted that Patient E "very likely has a psychological or physical dependency" upon the prescribed medicine, but declined to characterize the condition as addiction.

Dr. Frank McNiel's record of Patient F states "family did not want her in a drug rehab program" and "minimizes drug problem."

During his cross-examination, Dr. Frank McNiel agreed with the following quotations from a published article:

> "Narcotic analgesic drugs on (sic) the mainstay of therapy
> for patients with acute pain or chronic cancer related pain or
> Intensity."

He declined to agree with other statements in said exhibit which is not otherwise authenticated or offered in evidence.

.

The charges and supporting evidence against Dr. Janet McNiel arose out of her dealings with individuals identified anonymously in the record as 1, 2, 3, 4, 5 and 6.

The records of Dr. Janet McNiel indicate that on March 7, 1988, Patient 6 was "using too many Anexia-D" but the same entry shows that the prescription for the same drug was renewed; that, on March 23, 1988, 6 "wants pills early;" that, on March 28, 1988, the same medication was re-prescribed; that on April 6, 1988, the same prescription was renewed; that, on April 20, 1988, the chart for 6 indicates "too many Anexia and Darvocet;" that, on April 21, 1988, Dr. McNiel told 6 she was addicted and recommended addiction treatment and wrote on the chart "no more Anexia or Darvocet," that on May 4, 1988, Halcyon, a controlled substance was prescribed; that on May 5, 1988, Anexia D was again prescribed; and that prescriptions for this drug continued from June, 1988 to October, 1988; that, in October, 1988, Dr. McNiel began injections of Buprenex and prescribed 100 Percocets every two weeks; that, on January 6, 1992, the record states "patient has been taking too many pain pills, naughty, naughty," and that 100 more Percocet pills were prescribed on the dame date.

Dr. Janet McNiel testified that, in June, 1992, she charted Patient 2 with a note "caution with meds," that a psychiatrist told Dr. McNiel in September, 10, 1992, that 2 "doesn't need meds" and 2 was "milking Dr. McNiel for meds;" that 2 was charted for "no more meds," but from September 14, 1992 through January, 1993, controlled substances were prescribed for 2 without an examination.

Dr. Janet McNiel's June, 1992 chart for Patient 4 reflects a plan for drug screens because of "questions" about abuse, but prescriptions for controlled substances were continued to March 23, 1993, without a drug screen.

Dr. Janet McNiel's chart for Patient 5 on April 25, 1988, shows "prob. multiple substance abuse" and "no plan for substance abuse." On January 1989, the record shows recommendation for

drug rehabilitation and "we will not treat her any more." The record reflects that controlled substances were prescribed continuously throughout 1991 and 1992 without a charted physical examination.

The record of Dr. Janet McNiel's for Patient 6 states "using too many Anexia D cautioned, wants pills early - explained that she is addicted, thinks she can quit; recommended that she get help."
Told her to call Jim Dunlap at New Day if she needs help; patient has been taking too many pain pills, naughty, naughty."

Dr. Janet McNiel testified that "there were flags' in respect to Patient 2, and her record on this patient stated "caution with meds?" and "no more controlled meds."

The record of Dr. Janet McNiel on Patient J contains: "meds" recommended drug rehabilitation and "we will not treat her any more," and that Dr. McNiel did not read this entry 2 years later before prescribing pain relievers, but she wishes that she had "because I feel it would have changed things."

The foregoing records and testimony of the petitioners do not alone establish that their actions constituted misconduct as described in T.C.A. § 63-6-214.

In *Williams v. State Dept. Of Health*, Tenn. App. 1994, 880 S.W.2d 955, 958-9, this Court affirmed discipline of a physician, but said:

> [1] The petitioner contends that the Board's findings are not supported by substantial or material evidence because State did not produce expert testimony to establish a standard that the appellant violated. The State counters with the argument that all the Board members were physicians and therefore were able to judge the acts of the petitioner without any expert guidance. See *CF Industries v. Tennessee Public Service Commission*, 599

S.W.2d 536 (Tenn. 1980). The petitioner rejoins that to allow *958 members of the Board to base a decision on their unexpressed knowledge deprives the petitioner of a meaningful review of the decision. See *In re Williams*, 60 Ohio St.3d 85, 573 N.E.2d 638 (1991); *Dotson v. Texas State Board of Medical Examiners*, 612 S.W.2d 921 (Tx.1981).

We choose to avoid this conflict in the authorities. It is not necessary to resolve the conflict in this case, because at least one of the grounds on which the Board based its decision does not require the Board to rely on its own expertise.

In re Williams, cited above, was a State Medical Board case in which the Ohio Supreme Court affirmed the judgment of the Trial Court reversing the order of the Board for lack of substantial and material supporting evidence. The Court said:

In its arguments to this court, the board contends that *Arlen v. Ohio State Medical Bd.* (1980), 61 Ohio St.2d 168, 15 O.O.3d 190, 399 N.E.2d 1251, is dispositive. In *Arlen*, the physician was disciplined because he had written prescriptions for controlled substances to a person who the physician knew was redistributing the drugs to others, a practice prohibited by R.C. 3719.06-(A). The physician appealed on the ground that the board failed to present expert testimony that such prescribing practices fell below a reasonable standard of care.

We held that the board is not required in every case to present expert testimony on the acceptable standard of medical practice before it can find that a physician's conduct falls below this standard. We noted that the usual purpose of expert testimony is to assist the trier of facts in understanding "issues that require scientific or specialized knowledge or experience beyond the scope of common occurrences. ***" *Id*. at 173, 15 O.O. 3d at 193, 399 N.E.2d at 1254. The board was then made up of ten (now twelve) persons, eight of whom are licensed physicians. *Id*.; R.C. 4731.01. Thus, a majority of board members are themselves experts in the medical field who already possess the specialized knowledge needed to determine the acceptable standard of general medical practice.

[1] While the board need not, in every case, present expert testimony to support a charge against an accused physician, the charge must be supported by some reliable, probative and substantial evidence. It is here that the case against Dr. Williams fails, as it is very

different from *Arlen*.

[2] Arlen involved a physician who dispensed controlled substances in a manner which not only fell below the acceptable standard of medical practice, but also violated the applicable statute governing prescription and dispensing of these drugs. In contrast, Dr. Williams dispensed controlled substances in what was, at the time, a legally permitted manner, albeit one which was disfavored by many in the medical community. The only evidence in the record on this issue was the testimony of Dr. William's expert witnesses that his use of controlled substances in weight control programs did not fall below the acceptable standard of medical practice. While the board has broad discretion to resolve evidentiary conflicts, see *Conrad, supra*, 63 Ohio St.2d at 111, 17 O.O.3d at 67, 407 N.E.2d at 1267, and determine the weight to be given expert testimony, *Arlen, supra*, 61 Ohio St.2d at 174, 15 O.O.3d at 194, 399 N.E.2d at 1255, it cannot convert its own disagreement with an expert's opinion into affirmative evidence of a contrary proposition where the issue is one on which medical experts are divided and there is no statute or ruling governing the situation.

In *Dotson v. Texas State Board*, cited above, the Texas Supreme Court reversed the judgment of the Trial Court affirming a disciplinary order and said:

[2, 3] It is urged by the Board that, since all members of the Board are professionals, it was not necessary to introduce expert testimony that these drugs were not therapeutic as prescribed. The difficulty with this contention is that the APA limits the court's review to the record as made before the Board. A court obviously cannot review knowledge, however expert, that is only in the minds of one or more members. Section (q) of Article 6252-13a (APA) expressly allows an agency to take official notice of facts only in the following manner:

In connection with any hearing held under the provisions of this Act, official notice may be taken of all facts judicially cognizable. In addition, notice may be taken of generally recognized facts within the area of the agency's specialized knowledge. Parties shall be notified either before or during the hearing, or by reference in preliminary reports or otherwise, of the material officially noticed, including any staff memoranda or data, and they must be afforded an opportunity to contest the material so noticed. The special skills or knowledge of the agency and its staff may be utilized in evaluating the evidence.

There was no attempt by the Board to comply with this

section. Furthermore, a party must be accorded the right to cross-examine and rebut adverse evidence. See Article 6252-13a, Sections 13(g) and 14(p); *Richardson v. City of Pasadena*, 513 S.W.2d 1 (Tex.1974); McCormick on evidence § 353 (2nd ed. 1972).

T.C.A. § 4-5-313 provides in part:

Official notice may be taken of:

(A) Any fact that could be judicially noticed in the Courts of this state;

(B) The record of other proceedings before the agency;

(C) Technical or scientific matters within the agency's specialized knowledge; and

(D) Codes or standards that have been adopted by an agency of the United States, of this state or of another state, or by a nationally recognized organization or association.

Parties must be notified before or during the hearing, or before the issuance of any initial or final order that is based in whole or in part on facts or material noticed of the specific facts or material noticed and the source thereof, including any staff memoranda and data, and be afforded an opportunity to contest and rebut the facts or material so noticed. [Acts 1974, ch. 725, § 9; 1978, ch. 938, §§ 6-8; T.C.A., §§ 4-515, 4-5-109; Act 1982, ch. 874, § 52.]

There is no record that petitioners were notified that the members of the Board would consider as evidence those matters of expert information known to them, or as to which they held an opinion; and no record appears that such information or opinion was disclosed at the hearing with opportunity to cross-examine and contradict.

Under the circumstances, the undisclosed expertise of the Board cannot substitute for lack of evidence.

The Board found that respondent's acts and omissions constituted "a pattern of continued or

repeated negligence or incompetence;" "prescribing or otherwise distributing a controlled substance or any other drug not in the course of professional practice, or not in good faith to relieve pain and suffering, or not to cure an ailment, physical infirmity or disease;" and "prescribing or otherwise distributing to any person controlled substance or other drug if such a person is addicted to the habit of using controlled substance without making a bona fide effort to cure the habit of such a patient."

In order to affirm the Boards' "Conclusions of Law," this Court must find in the record, expert testimony to support the finding of the occurrence of the violations of the statute stated in the Conclusions of Law.

The emphasized words and phrases are terms of art in the science of medicine, and the Courts are not qualified to define or apply them to the facts of these cases. In cases involving scientific or technical evidence, the "substantial and material evidence standard" in Tenn. Code Ann. § 4-5-322(h)(5) requires a searching and careful inquiry that subjects an administrative body's decision to close scrutiny. *Wayne Co. v. Tennessee Solid Waste Disposal Control Board*, 756 S.W.2d 274, 280, *citing Crounse Corp. v. ICC*, 781 F.2d 1176, 1187 (6th Cir.), *cert. denied*, 479 U.S. 890, 107 S.Ct. 290, 93 L.Ed.2d 264 (1986); *Cranston v. Clark*, 767 F.2d 1319, 1321 (9th Cir. 1985). Here that scrutiny revealed a gap between the technical proof the Board established, and the statutory provisions it alleged the Appellants violated.

The only testimony offered by the State in this regard was that of Dr. Brian W. Christman, which included the following:

> Q.     Dr. Christman, did you review medical records on behalf of Patient A?
>
> A.     Yes, sir, I did.
>
> Q.     What were your conclusions, or your respondent's prescribing practices for this patient?
>
> A.     It was my opinion that in the absence of some kind of documental pathology, this represents significantly over-

prescribing.

Q.     Dr. Christman, did you have an opportunity to review records provided on Patient B?

A.     I would say that the prescription of Phenobarbital without a clear indication would not meet the standard of care.

Q.     Dr. Christman, did you have an opportunity to review records provided by my office regarding Patient C?

A.     Yes, sir, I did.

Q.     Did you arrive at any opinions regarding the respondent's prescribing practices with respect to that patient?

A.     Yes, sir, I did.

Q.     Could you indicate to the Board what those were?

A.     Despite what seems to be transparent drug seeking behavior, he wasn't referred to mental health professionals. I felt this represented significant over-prescription of narcotics without adequate indication.

Q.     Did you feel that this conduct fell below the applicable statewide standard of care?

A.     Yes, sir, I did.

Q.     Doctor, did you review records provided by my office with respect to Patient D?

A.     Yes, sir, I did.

Q.     What were your opinions, Doctor, regarding the respondent's prescribing practice with respect to Patient D?

A.     I thought it was fairly clear that the deterioration in her mental status was associated with the cumulative dosing of narcotics and sedatives. I thought the anti-psychotic medication was probably prescribed without adequate evaluation.

Q.     Did you consider this course of treatment for Patient D to fall below the applicable statewide standard of care?

A.     Yes, sir.

Q.      Dr. Christman, did you review records provided by my office on Patient E?

A.      Yes, sir, I did.

Q.      And what were your opinions regarding the respondent's prescribing and treatment practices for Patient E?

A.      I thought this reflected over-prescription of narcotics, again, without clear indication in a patient who significantly manifested addiction potential.

Q.      Did you consider the respondent's treatment and prescribing of controlled substances to this patient to fall below the applicable statewide standard of care?

A.      Yes, sir.

Q.      Dr. Christman, did you review records provided to you by my office on behalf of Patient F?

A.      Yes, sir, I did.

Q.      Dr. Christman, what were your opinions regarding respondent's treatment and prescribing of Patient F?

A.      I thought the persistent dosing of Percocet and Darvocet without indication would fall below the state-wide standard of care.

Q.      Dr. Christman, did you evaluate records provided to you by our office with respect to Patient G?

A.      Yes, sir, I did.

Q.      Dr. Christman, did you arrive at any opinions regarding the propriety of the respondent's treatment of or prescriptions for this patient?

A.      I did. I think the failure to perform an examination in the presence of neurologic symptoms, particularly with the incontinence and leg weakness, fell below the statewide standard of care.

Q.      Dr. Christman, did you have occasion to review records provided to you by my office regarding Patient H?

A.      Yes, sir, I did.

Q.      What were your opinions, Doctor, regarding the respondent's treatment of and prescribing practices for this patient?

A. I felt it fell below the statewide standard of care.

Q. Doctor, did you arrive at any conclusions or opinions regarding the respondent's treatment of and prescribing controlled substances for Patient I?

A. I did. But in this case, I think it's close, but I can't definitively say it fell below the statewide standard of care.

Q. So your testimony is that you do not believe that the treatment or the prescribing for Patient I fell below the statewide standard of care.

A. No, sir. I said that I can't tell whether it did. I can't be certain.

Q. Dr. Christman, did you have occasion to review records provided to you by our office regarding Patient J?

A. Yes, sir.

Q. What were your opinions or conclusions, Doctor, regarding the respondent's treatment of and prescribing for Patient J?

A. The lack of appropriate evaluation and continued prescriptions of large amounts of narcotics, I felt made the management of the case fell below the statewide standard of care.

Q. Did you have occasion to review records provided to you by our office on Patient Number 1?

A. Yes, sir, I did.

Q. What were your conclusions or opinions regarding the respondent's treatment of or prescribing practices for Patient 1?

A. I felt that the prescribing practices fell below the statewide standard of care.

Q. Dr. Christman, did you evaluate medical records provided to you by my office regarding Patient Number 2?

A. Yes, sir, I did.

Q. What were your conclusions or opinions, Dr. Christman, regarding the respondent's treatment of or prescribing practices for this patient?

A. I felt that the prescribing practices fell below the

statewide standard of care. There were many indications of drug seeking behavior.

Q.      Dr. Christman, did you have occasion to review medical records provided to you by my office on Patient Number 3?

A.      Yes, sir, I did.

Q.      What were your conclusions or opinions, Doctor, regarding the propriety of the respondent's treatment of or prescribing for this patient?

I felt that because of the persistent headaches, additional evaluation by a specialist, perhaps a neurologist or pain specialist, should have been sought instead of continued prescription of high doses of narcotic analgesics.

Q.      Doctor, did you have occasion to review medical records provided to you by our office on behalf of Patient Number 4?

A.      Yes, sir, I did.

Q.      Doctor, what were your conclusions or opinions regarding the treatment of or the prescribing practices of the respondent relating to this patient?

A.      I felt that this case fell below the statewide standard of care.

Q.      Dr. Christman, have you had occasion to review records provided to you by my office related to Patient Number 5?

A.      Yes, sir, I did.

Q.      What were your opinions, Doctor, regarding the respondent's treatment of and prescribing for this patient?

A.      This was a 37 year old woman with a history of a motor vehicle accident with chronic low back pain. The physician, in the chart, reported a diagnosis of multiple substance abuse on April 1988, and recommended drug rehabilitation on January of 1989. Nevertheless, beginning in August of 1991, she began prescribing Propoxyphene and Valium, and did so for the next year.

I thought that the practice of prescribing continual prescriptions of controlled substances to a patient with a known problem of substance abuse fell

below the acceptable standard of care in the State of Tennessee.

Q. Dr. Christman, did you have occasion to review the medical records provided to you by my office on Patient 6?

A. Yes, sir, I did.

Q. What were your conclusions or opinions regarding the respondent's treatment of and prescribing practice for this patient?

A. I felt that the prescription practice fell below the statewide standard of care.

Q. Did you find that this practice, in your opinion, violated the applicable statewide standard of care?

A. Yes, sir.

It is seen that the testimony of Dr. Christman was limited to the "statewide standard of care", and "significantly over prescribing."

The words "statewide standard of care" and "over prescribing" are not found in the quoted statute, the charges, or the "conclusions of law," and are not the equivalent of the words of the statute. No substantial and material expert evidence is found in the testimony of Dr. Christman or elsewhere that the acts and omissions of the petitioners constituted the degree of misconduct for which the statute authorizes discipline.

Inasmuch as the members of the Board were physicians, it is possible that they utilized their own expertise in concluding that the acts and omissions of respondents qualified as misconduct specified in the statute. However, nothing is cited or found in this record to indicate that such expert evaluation by the Board took place. Absent evidence of such express exercise of expertise by the Board, this Court is unable to presume that it took place.

The Board insists that the testimony of petitioners supplies the missing expert testimony. The

above quoted testimony of petitioners identifies shortcomings in their treatment of patients, but does not admit that any of the shortcomings amounted to that conduct described in the statute and in the "conclusions of law of the Board."

The conclusions of the Board and its judgment are without necessary support of necessary material and substantial evidence, and cannot be affirmed.

The decision of the Board and it's affirmance by the Trial Court are reversed and vacated. All costs in this Court and in the Trial Court will be paid by the Respondent-Appellee. The cause is remanded to the Trial Court for any necessary concluding procedure.

**REVERSED, VACATED AND REMANDED.**

_____
HENRY F. TODD
PRESIDING JUDGE, MIDDLE SECTION

CONCUR:

_____
SAMUEL L. LEWIS, JUDGE

CONCURS IN SEPARATE OPINION
WILLIAM C. KOCH, JR., JUDGE